UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

- against -

MICHAEL HEWITT,

Defendant.

Case No.: 17-CR-00164(ENV)

**DEFENDANT'S SENTENCING MEMORANDUM**

## I.      INTRODUCTION

Michael Hewitt elected to exercise his constitutional right to a trial and now, following the jury's guilty verdict, he stands before the Court for sentencing. He has been incarcerated for this matter at MDC Brooklyn since February 2017, and has suffered through that facility's pandemic lockdowns and a power outage. The Court should conclude – as does the Department of Probation – that his Sentencing Guidelines range is 77 to 98 months, based upon an offense level of 24 and a Criminal history Category IV. In light of the sentencing factors enumerated in 18 U.S.C. § 3553(a), the defense respectfully requests that the Court sentence Michael to 74 months, or time served, followed by a term of post-release supervision.[1] Such a sentence would be sufficient but not greater than necessary to satisfy the purposes of sentencing. It would also appropriately account for the abhorrent conditions that Michael has endured at MDC Brooklyn.

---

[1] A 74-month sentence would probably be closely equivalent to time served in Michael's case, as he will have already spent approximately 64 months in custody by the time of his sentencing hearing. That calculation accounts for Michael's 54 days of good time credit per year, minus a disciplinary penalty resulting in a loss of 27 days of good conduct time credit. See PSR, at Paragraph 64.

## II.   GUIDELINES CALCULATIONS

Michael does not dispute the Department of Probation's revised conclusions about his Guidelines calculations. Per the Addendum to the Presentence Investigation and Report (hereinafter referred to as "PSR"), the Department of Probation concedes that Michael's applicable offense level is 24 and that he belongs in Criminal History Category IV.[2] Such a conclusion would result in a recommended Guidelines sentencing range of 77-98 months.

## III.   <u>SENTENCING ANALYSIS</u>

### A.  The facts and circumstances of the offense

The trial jury concluded that Michael engaged in a conspiracy to purchase almost 300 methamphetamine capsules. Specifically, the evidence demonstrated that after Michael and his co-defendants arranged for a drug sale in New York City, Michael drove down from upstate New York to meet some of his co-defendants in the Bronx. Thanks to a wiretap operation, law enforcement anticipated the transaction and were waiting for Michael and his co-defendants when they met inside of a car on the side of the road in the Bronx. Police arrested them and found drugs and cash inside the car (PSR, at Paragraphs 6-14).

Though the jury concluded that this quantity of dugs was intended for distribution, it was not a major wholesale-level amount by any means, either. Notably, the evidence at trial did not suggest that Michael was a high-level narcotics trafficker or a supervisor of any sort of significant operation. For the purposes of this sentencing phase, the Court could reasonably conclude that Michael was a street-level drug dealer caught purchasing an unexceptional quantity of drugs. As such, the requested sentence seems sufficient for the scale of the offense. 18 U.S.C. § 3553(a)(1).

---

[2] Probation initially concluded that Michael was a career offender based upon a conviction in Ohio. However, Probation withdrew that contention in response to the defense's objections to the PSR.

### B.  The jury's verdict and Michael's constitutional right to trial

Unlike most federal defendants at sentencing, Michael will not be receiving a downward reduction in his offense level for acceptance of responsibility. Had he pleaded guilty prior to trial and received a three-level reduction for acceptance of responsibility, his sentencing range under the Guidelines would have likely been between 57-71 months in prison (offense level 21 at Criminal History Category IV). Michael understands that he chose to forego that offense level reduction by proceeding to trial, but he respectfully requests that he not be punished any further for his decision to exercise his constitutional right to a jury trial, either. That is not an unreasonable request; after all, a "vindictive sentence" would be unconstitutional. The principle underlying that rule is that "[t]o punish a person because he has done what the law plainly allows him to do [i.e. proceed to trial] is a due process violation of the most basic sort." Bordenkircher v. Hayes, 434 U.S. 357, 363, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978).

Some have suggested that the federal criminal justice system in fact does have a built-in trial penalty that counterbalances – or conflicts with – the system's interest in due process and fairness. Indeed, it is beyond dispute that defendants who plead guilty typically receive more favorable sentences than those defendants convicted at trial.[3] "The friction is obvious in the federal system," Judge Weinstein once observed in analyzing the system's interest in being efficient with

---

[3] Various commentators have offered solutions to combat the negative consequences that can arise from the imposition of the trial penalty. See e.g. Jed S. Rakoff, Why Prosecutors Rule the Criminal Justice System – And What Can be Done About It, 111 Nw. U. L. Rev. 1429, 1436 (2017) (suggesting that prosecutors be "required to spend six months out of every three years of their term… serving as defense counsel for indigent defendants"); James Vorenberg, Decent Restraint of Prosecutorial Power, 94 Harv. L. Rev. 1521, 1523 (1981) (suggesting strict administrative guidance to curb prosecutorial discretion); National Association of Criminal Defense Lawyers, supra, at 12-13 (making ten recommendations to reduce the force of the trial penalty including adopting a principle of "proportionality between pre-trial and post-trial sentencing"); see also Garcia, supra, at * 106.

its competing interest in fairness and due process. See Garcia v. Herbert, 2018 U.S. Dist. LEXIS

203454 (E.D.N.Y.). Judge Weinstein's decision in a habeas petition raising a vindictive sentencing

argument cited a report analyzing the disappearance of criminal trials in federal court:

> Guilty pleas have replaced trials for a very simple reason: individuals who choose
> to exercise their Sixth Amendment right to trial face exponentially higher sentences
> if they invoke the right to trial and lose. Faced with this choice, individuals almost
> uniformly surrender the right to trial rather than insist on proof beyond a reasonable
> doubt, defense lawyers spend most of their time negotiating guilty pleas rather than
> ensuring that police and the government respect the boundaries of the law including
> the proof beyond a reasonable doubt standard, and judges dedicate their time to
> administering plea allocutions rather than evaluating the constitutional and legal
> aspects of the government's case and police conduct.

Id, at * 103-104, citing National Association of Criminal Defense Lawyers, the Trial Penalty: The

Sixth Amendment Right to Trial on the Verge of Extinction and How to Save It, 5 (2018), available

online at www.nacdl.org/trialpenaltyreport; but see David S. Abrams, Putting the Trial Penalty on

Trial, 51 Duq. L. Rev. 777, 778 (2013) ("[N]ot only is there no evidence for a trial penalty, there

appears to be a trial discount!"); Andrew Chongseh Kim, Understanding the Trial Penalty: An

Empirical Analysis of the Federal Trial Penalty and Critique of the Abrams Study, 84 Miss. L.J.

1195, 1199 (2015) ("This Article exposes significant conceptual and methodological errors that

undermine the conclusions of the Abrams study."). Echoing this sentiment, the U.S. Supreme

Court has acknowledged that our criminal justice system has become a "system of pleas, not a

system of trials," Lafler v. Cooper, 556 U.S. 156, 170, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012),

since "[n]inety-seven percent of federal convictions and ninety-four percent of state convictions

are the result of guilty pleas."

It would be impossible for the criminal justice system to operate if every defendant elected

to go to trial, so the system certainly has an interest in encouraging defendants who should plead

guilty to do just that. On the other hand, though, the penalties imposed upon those convicted at

trial should not be so disproportionately severe as to coerce defendants to surrender, either, because that would create serious Sixth Amendment issues. Here, Michael respectfully submits that the proposed sentence in his case would adequately account for his failure to accept responsibility while also being fair and proportionate in relation to the sentence he might have received had he pleaded guilty prior to trial. 18 U.S.C. § 3553(a)(6) and 18 U.S.C. § 3553(a)(2)(A).

### C. Michael's history and characteristics

Michael's history and characteristics also support some leniency in this case. To begin, Michael sustained childhood abuse that may partially explain his rocky adulthood, which has admittedly included sporadic employment, tumultuous relationships with women, and frequent involvement with the criminal justice system. Michael's mother despised his father so much that she would beat him whenever he reminded her of him (PSR, at Paragraph 55). Understandably, Michael had a poor relationship with his abusive mother, who shared custody of Michael with Michael's father. Michael dropped out of high school and basically stumbled into adulthood, struggling to find his footing, so to speak. Shockingly, Michael has been shot on three separate occasions and stabbed on another occasion. Once, he was a victim of a stray bullet in a bad neighborhood and once he was shot while resisting a robbery. The other two assaults were perpetrated by angry lovers. In this regard, Michael has been much unluckier than most (PSR, at Paragraphs 66-69). Sadly, one of Michael's brothers was murdered in Philadelphia years ago and Michael's beloved father passed away in Jamaica while Michael was incarcerated in this matter. (PSR, at Paragraphs 52-53). Of course, Michael was unable to attend his father's funeral on account of his incarceration.

Though Michael has not been consistently employed as an adult, he is determined to not repeat the mistakes that landed him here. The most stable period of his life appears to have been

when he was a partner in a barbershop business. Unfortunately, that business fell apart after his partners moved away to go back home (to Florida and Trinidad). He has been availing himself of educational programming at MDC Brooklyn (see Exhibit A [certificates]) and hopes to secure some productive and regular employment as soon as possible upon his release.

Finally, to his credit, Michael maintains good relationships with his three children, who are supportive and seem well-adjusted; his daughter works in a daycare and goes to school, one of his sons works as a car salesman in Manhattan, and another son is in high school (PSR, at Paragraphs 59-61).

### D.  The inhumane conditions Michael has endured at MDC Brooklyn

Finally, in terms of providing for just punishment for this offense, the Court should strongly consider the incredible hardship that Michael has endured at MDC Brooklyn over the past 66 months. It cannot be said that MDC Brooklyn was ever a nice place to visit, but Michael has been there through undoubtedly the most hellish period in that miserable building's history.

To begin, in January 2019, the facility experienced a power outage that lasted a week and resulted in temperatures inside dropping into the single digits. Inmates, including Michael, froze in their cells in the dark with insufficient blankets. But, "[t]he blackout crisis was just the latest episode in a long history of neglect and brutality at the jail, one that has been document in previous Justice Department Reports… Investigators over the years have issued findings that suggest the jail is among the worst in the federal system, determining at different times that prisoners have been beaten, raped or held in inhumane conditions." Annie Correal and Joseph Goldstein, "'*It's Cold as Hell': Inside a Brooklyn Jail's Weeklong Collapse,*" NEW YORK TIMES, Feb. 9, 2019 (available online at https://www.nytimes.com/2019/02/09/nyregion/brooklyn-jail-no-heat-inmates.html). Indeed, as one former warden at the jail explained, "It's my opinion… [that] MDC

was one of the most troubled, if not the most troubled facility in the Bureau of Prisons." Id. Subsequent audits of the facility revealed long-standing issues with temperature regulation in the building, as well as the delivery of medical services for inmates.

Unfortunately, those medical services issues were exacerbated when the COVID-19 pandemic swept across the country. Like most of the other inmates at MDC, Michael got sick shortly after the initial onset of the pandemic; Michael in fact became infected with COVID variant a second time, as well. As the Court is aware, MDC Brooklyn eventually went on lockdown to prevent the spread of the coronavirus. The protocols put in place in response to the pandemic were soul-crushing for the residents of MDC and MCC. Visits from family members were canceled. For long stretches, the incarcerated individuals had less than an hour a day outside of their cells to shower, check email, or make phone calls. Though they were officially supposed to get an hour a day, in practice is was usually more like fifteen-thirty minutes out of their cells in total. The incarcerated individuals would normally have to choose between showering and calling their families, so everyone's personal hygiene started to suffer. Michael was unable to get reliable news from the outside world about the pandemic. Worst yet, he could not get regular updates about the health of his family. Compounding things, the Corrections officers at MDC routinely flouted the safety protocols and wandered around without facemasks or other protective gear. Though he couldn't always see them, Michael could often hear other incarcerated people getting sick in neighboring cells.

Putting aside the appalling Third World conditions inside of MCC for which this country should be ashamed, the worst thing that the incarcerated individuals have suffered has been the separation from their families. Civilian visitors have not been allowed, and the incarcerated individuals have generally not been given enough time outside of their cells to make meaningful

or regular telephone calls. Michael was not able to see his family, who are normally very supportive of him. This aspect of his incarceration has been absolutely devastating for him psychologically (PSR, at ¶ 49). It is a uniquely terrible thing that the incarcerated individuals at MDC New York have had to endure these past few years, and it should distinguish their sentences from those in years prior to the pandemic.

Many courts in this district have recognized the especially inhumane conditions at MCC of late. Most prominently, in April, Judge McMahon declared that the conditions at the facility were "inhuman" and that MCC was "run by morons." <u>See</u> Shayna Jacobs, "*Judge says 'morons' run New York's federal jails, denounces 'inhuman' conditions*," WASHINGTON POST, May 7, 2021 (available online at https://www.washingtonpost.com/national-security/jails-run-by-morons-judge-says/2021/05/07/3b8b00c4-af46-11eb-acd3-24b44a57093a_story.html). During the sentencing hearing of a defendant who was incarcerated at MCC at the same time that Michael was at MDC, Judge McMahon further opined that the agency's ineptitude and failure to "do anything meaningful" at the Metropolitan Correctional Center in Manhattan and the Metropolitan Detention Center in Brooklyn amounted to the "single thing in the five years that I was chief judge of this court that made me the craziest." Finally, the Judge explained, "It is the finding of this court that the conditions to which she was subjected are as disgusting, inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that."

Additionally, Michael was forced to endure a "gun lockdown" at MDC. MCC New York experienced a "gun lockdown" just prior to the onset of the pandemic, after a Correction officer apparently smuggled a firearm into MCC for an inmate. Later, MDC similarly suspected an officer of having done the same thing at MDC while Michael was there. The apparent solution to this problem – created by BOP staff – was to send a shock team of officers in tactical riot gear (the

"green team") to conduct random searches of inmate cells at odd hours of the night. The blameless individuals in Michael's unit were otherwise confined to their cells during this lockdown while armored stormtroopers hunted at random hours for a firearm seemingly smuggled into the building by an employee.

Several other judges in this district have explicitly given downward variances to defendants who have suffered at BOP facilities during the pandemic, oftentimes citing the statutory provision relating to just punishment (18 U.S.C. § 3553(a)(2)(D)). For example, Judge Oetken commented that for sentencing purposes, any time spent at MCC during COVID should count at least 1.5 or 2 times the actual time. See U.S. v. Daniel Gonzalez, 18-cr-669 (JPO) (Document # 250 [sentencing hearing transcript]).[4] See also United States v. Juan Carlos Aracena de Jesus, 20-cr-19 (PAE) (S.D.N.Y. July 1, 2020) (substantial downward variance from 30 to 37 months to six months in part because of the "horrific conditions" at MCC during the pandemic); United States v. Morgan, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020) (cutting the sentence to less than half of the low end of the Guidelines based in part on conditions at MDC during the pandemic and condemning the conditions at MCC and MDC prior to the current crisis).

We wholeheartedly agree with these courts. While we are not seeking a downward departure due to the "gun lockdown" and COVID-19 pandemic, we definitely believe that Michael's incarceration during the power outage, the "gun lockdown," and the pandemic warrants

_____

[4] "Now, the defendant has already served 24 months of detention and that really has been under conditions that have been extraordinarily harsh. Most of the time has been in lockdown conditions 23 hours a day, basically like solitary confinement with no access to visitors for most of that time, virtually limited programming. *And I do believe that because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served.* So I think having served 24 months is equivalent to having served three years. That's what I believe in terms of how punitive it's been and how harsh it's been." (emphasis added).

9

a significant downward variance. After all, he personally endured the worst aspects of those terrible periods at MDC Brooklyn.

### E.  The co-defendants' sentences

Finally, the Court should keep in mind the sentences doled out to Michael's co-defendants in this matter. 18 U.S.C. § 3553(a)(6). The court sentenced co-defendant Paul Mitchell to time served in December 2019, sentenced co-defendant Daniil Krapman to time served in April 2020, and sentenced co-defendant Bonzelee Nimmons to an aggregate sentence of 78 months for his conviction in this matter and his violation of federal supervised release from a 2009 case (09-cr-844). Those other sentences strongly support the conclusion that the proposed sentence for Michael would be reasonable.

### A.  <u>CONCLUSION</u>

All in all, the facts and circumstances suggest that Michael should not spend much more time in custody, if any. After all, the Guidelines suggest a sentence of between 77 and 98 months for this offense, and Michael has already been incarcerated for approximately 64 months at one of the nation's most inhospitable prisons. A sentence amounting to time served, followed by a period of supervised release, would be plainly reasonable here. Assuming good time credit, a 77-month sentence (i.e. within the Guidelines) would equate to approximately 66 months of actual time in custody. Many if not most judges in this district have been granting some downward sentencing reductions to those defendants who have had to suffer through the pandemic lockdowns at MDC Brooklyn, and Michael has spent over five years at MDC Brooklyn. Michael has suffered through the worst of the coronavirus protocols as well as the power outage at MDC Brooklyn, under conditions that have been universally decried. Given these conditions that Michael has endured and the sentence suggested by the Guidelines, the defense request for a sentence amounting to time

served is actually quite modest. In the least, a sentence of no greater than 77 months would be sufficient, but not greater than necessary, to achieve the aims of sentencing.

Finally, should the Court sentence Michael to additional custody, the defense requests that he be designated to a facility close to his children in New York City.

Respectfully submitted,

By:      _____/s/_____

Matthew J. Galluzzo, Esq.

The Law Office of Matthew Galluzzo PLLC
11 Broadway Suite 715
New York, New York 10004
Office: (212) 344-5180
Email: matthew.galluzzo@criminal-defense.nyc

CC:
AUSA Michael Gibaldi

VIA ECF